IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ALEXANDER KRIVOULIAN,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Case No. 20-cr-00029-DKW<br>Case No. 22-cv-00433-DKW-RT<br><br>**ORDER DENYING PETITIONER'S 28 U.S.C. § 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE** |

Before the Court is Petitioner Alexander Krivoulian's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Dkt. No. 30 ("Motion").[1] Krivoulian is currently facing deportation after serving eight months in prison for money laundering, pursuant to a plea agreement wherein Krivoulian pled guilty to laundering between $15,000 and $40,000, in violation of 18 U.S.C. § 1956. In his Motion, Krivoulian claims that his trial counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), entitling him to relief, because counsel failed to accurately inform him of the immigration consequences of his plea. Because Krivoulian cannot show he was prejudiced by any such deficient performance by his trial counsel, the Motion is DENIED.

---

[1] All docket citations refer to the Criminal Case No. 20-00029-DKW.

# LEGAL STANDARDS

## I. 28 U.S.C. § 2255

Section 2255 permits a sentencing court to vacate, set aside, or correct a prisoner's sentence if it concludes "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."

## II. Ineffective Assistance of Counsel

Under *Strickland*, a petitioner must satisfy a two-part test to demonstrate that his trial counsel was constitutionally ineffective.[2] 466 U.S. at 689. First, he must show that his counsel's performance was deficient, meaning it was not "within the range of competence demanded of attorneys in criminal cases," or that it "fell below an objective standard of reasonableness." *Hill v. Lockhart*, 474 U.S. 52, 56–57 (1985); *Delgado v. Lewis*, 223 F.3d 976, 980 (9th Cir. 2000); *see also Strickland*, 466 U.S. at 689 (explaining there is a "strong presumption" of reasonably effective assistance).

Second, he must show that he was actually prejudiced by the deficient performance, meaning that the deficiency "affected the outcome" of the case "to

---

[2]The Sixth Amendment to the U.S. Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right has been construed as ensuring "reasonably effective assistance." *Strickland*, 466 U.S. at 687.

2

such an extent that the resulting proceedings were unreliable." *Hill*, 474 U.S. at 58–59; *Delgado*, 223 F.3d at 980; *see also Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Where, as here, a petitioner challenges the validity of a *guilty plea*, *Strickland*'s second prong requires the petitioner to show "a reasonable probability that, but for his counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Womack v. Del Papa*, 497 F.3d 998, 1002 (9th Cir. 2007) (quoting *Hill*, 474 U.S. at 57–59); *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("[A] defendant must show the outcome of the plea process would have been different with competent advice.").

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On February 25, 2020, a single-count Information charged Krivoulian with money laundering in violation of 18 U.S.C. § 1956. Dkt. No. 1. On July 24, 2020, Krivoulian entered a plea of guilty to the single-count Information, *see* Dkt. No. 10, pursuant to a Memorandum of Plea Agreement ("MOPA"), which provided, in part, "The parties agree that, in total, the defendant laundered more than $15,000

but less than $40,000." Dkt. No. 12 at 6.[3]  The MOPA also included the following provisions describing the immigration consequences of Krivoulian's guilty plea:

> Penalties: 7. The defendant understands that the penalties for the offense to which he is pleading guilty include: . . .
>
> c. **Consequences of Conviction for Non-U.S. Citizens.** The defendant has been advised by counsel and understands that because the defendant is not a citizen of the United States, the defendant's conviction in this case makes it practically inevitable and a virtual certainty that the defendant will be removed or deported from the United States.  The defendant may also be denied United States citizenship and admission to the United States in the future.

*Id.* at 3–4.  Krivoulian and his counsel signed the last page of the MOPA.

During the July 24, 2020 plea hearing, Krivoulian appeared with his attorney, Gary Singh.  While under oath, Krivoulian informed the Court that no one had threatened or forced him to plead guilty, and that no one had made him any promises or assurances in order to entice him to plead guilty other than the promises contained in the MOPA.  Plea Hearing Transcript ("Plea Tr.") at 3:10–12, 9:1–14, Dkt. No. 33-1.  Krivoulian also stated under oath that he had read the MOPA in full, had discussed it with Singh, and was confident that he understood each of the terms it contained.  *Id.* at 11:4–15.  During the hearing, the Government highlighted that, by pleading guilty, Krivoulian was agreeing that he had "laundered more than $15,000 but less than $40,000."  *Id.* at 13:11–13.

---

[3]This amount was specified, even though Count 1 of the Information only charged Krivoulian with tendering a check in the amount of $1,850.  *See* Dkt. No. 1.

The Court also informed Krivoulian of the immigration consequences of his guilty plea, and Krivoulian stated that he understood:

The Court: Mr. Nammar, what are the potential penalties that Mr. Krivoulian faces for pleading guilty to Count 1?

Mr. Nammar: Yes, Your Honor.  As set forth in paragraph 7 of the plea agreement, they include a term of imprisonment of up to 20 years; a fine of $250,000, plus a term of supervised release of up to three years; there is also a $100 mandatory special assessment.  In addition, there are certain immigration consequences associated with his guilty plea because he is not a citizen of the United States.

The Court: Among the immigration consequences, Mr. Krivoulian, is the following: *You need to understand that by virtue of entering into this plea of guilty, which would be considered a felony offense, it is a virtual certainty that you will be removed or deported from the United States*; you will be denied admission to the United States in the future, were you to seek such admission; and finally, were you to apply for U.S. citizenship at some point in time, it is a virtual certainty that that application would be denied.  Do you understand all of that?

The Defendant: Yes, Your Honor.

Mr. Singh: Judge, just for the record, I did discuss with him all of the immigration consequences.

The Court: Okay, I appreciate that.  And understanding the immigration consequences and the other sentencing penalties that Mr. Krivoulian potentially faces, Mr. Singh, do you agree that we have gone over and discussed all of the potential penalties that your client faces for pleading guilty to this particular count?

Mr. Singh: Yes, Your Honor.

The Court: And, Mr. Krivoulian, do you, sir, understand, other than the immigration consequences that you and I just went over, do you understand all of the potential penalties that you face as Mr. Nammar described just a few minutes ago?

  The Defendant: Yes, Your Honor.

*Id.* at 9:18–11:3 (emphasis added).

  On January 7, 2021, this Court sentenced Krivoulian to eight months' imprisonment, followed by three years of supervised release. Dkt. No. 21. Krivoulian did not appeal his sentence.

  On September 29, 2022, Krivoulian filed the instant Motion, claiming his plea was unknowing and unintelligent because his counsel inaccurately told him that his plea would not result in his deportation. Dkt. No. 30 at 4; *see also* Dkt. No. 39 at 1 ("As I was preparing for the hearing where I pled guilty my lawyer Gary Singh told me that I would not face any immigration consequences based on the crime I was charged with."). More specifically, he claims his attorney essentially advised him to ignore whatever this Court told him regarding immigration consequences during the plea hearing because the Court's instructions would not actually apply to him:

> Mr. Singh told me that the judge would tell me that I would face immigration issues like deportation but that the judge had to say that to everyone. Basically Mr. Singh said to listen to the judge and his warnings about immigration but the immigration consequences would not apply to me. Mr. Singh reiterated that regardless of what the judge said, I would face no immigration consequences based on the crime I pled to pursuant to the plea agreement. . . . As the hearing was happening, I was under the impression that the judge just had to say those things to everyone even if it didn't apply to them.

Dkt. No. 39 at 1; *see also* Dkt. No. 30 at 4. Similarly, Krivoulian claims his attorney told him to sign and agree to the MOPA even though it too stated that it was "practically inevitable and a virtual certainty that [he] w[ould] be removed or deported from the United States," *see* Dkt. No. 12 at 3–4, again advising that this provision did not actually apply to Krivoulian. Krivoulian further explains his state of mind during the plea hearing:

> During the hearing when Judge Watson was asking if I knew about the consequences I said yes because my lawyer basically told me that the judge had to tell everyone about these things and that he was just explaining the worst-case scenario even though it would not be applicable to me. I assumed that the immigration consequences would not be applicable to me because Mr. Singh told me I would not be facing deportation.
>
> Mr. Singh and I went through the plea agreement, but I didn't understand every term of it, I had to rely on him to explain a lot of things. After Mr. Singh explained those terms, I thought I understood the agreement that I was signing. One of the things that he explained was that by pleading guilty I didn't have any risk of deportation because this was not an aggravated felony. . . . Even though Judge Watson said some things about it being a certainty I would be deported, I thought they didn't apply to me based on what my lawyer told me well before the hearing and when he was explaining the plea agreement to me.

Dkt. No. 39 at 2.

Krivoulian also claims Singh implied that he was pleading guilty to money laundering in the amount of $1,850—not $15,000-$40,000 as the MOPA stated—and thus that he would not be deported as a result of the conviction because he "would be able to obtain relief from an immigration judge." Dkt. No. 30 at 4 ("In

7

the MOPA, the money laundering amount was listed as $15,000 to $40,000 when the actual amount was $1,850. My attorney did not inform me that the amount of [money] contained in the MOPA would make the money laundering count an aggravated felony and I could not seek any relief from an immigration judge.").

Krivoulian states that it was not until he received a Notice to Appear from the Department of Homeland Security on December 16, 2021 that he "understood that Gary's assessment was incorrect that something in the plea agreement made the crime deportable." Dkt. Nos. 30 at 11; 39 at 1. At that point, Krivoulian contacted Singh, who told him "he would contest the allegation [on Krivoulian's behalf] that [Krivoulian] was convicted of an aggravated felony because $1,850 was well below the limit to qualify as an aggravated felony." Dkt. No. 30 at 11. But on July 14, 2022, "the immigration judge cancelled the hearing and [Singh]'s request was denied." *Id.*

Krivoulian asserts that he would not have pled guilty or signed the MOPA if he had known the plea agreement would result in deportation. *See* Dkt. No. 39 at 2 ("If I had been advised by my attorney that there was even a small possibility of being deported as a result of pleading guilty to the crime under the plea agreement I would not have done it."); *ibid.* ("Had I known that there was a possibility I would be deported, I would not have pled guilty under the plea agreement.); Dkt.

No. 30 at 4 ("Had I been correctly advised of the immigration consequences of my plea, I would not have entered a plea pursuant to the MOPA.").

Finally, Krivoulian claims that statements made by this Court during his January 2021 *sentencing* hearing convinced him that his attorney had been correct, and he would not be facing deportation:

> At my sentencing on January 7, 2021, Judge Watson said things about me being in the U.S. and being unsure of whether deportation was applicable. Judge Watson's comments led me to believe that Mr. Singh was 100% correct and I wouldn't be facing deportation. Specifically Judge Watson said that it was "unclear whether or not [I] will be deported." He also said that there are "some signs in here that maybe deportation is not in your future." These comments were different than those Judge Watson made when I pled guilty where he said it was a virtual certainty that I would be deported. Judge Watson also commented that the sentencing guideline 5D1.1 talks about not imposing a term of supervised release for someone who is likely facing deportation, and then imposed a three-year supervised release term. Based on all of this I believed Gary was correct and I would not be facing deportation. I believed that deportation was not a certainty, and that Mr. Singh was correct that the judge had just told me that because he had to tell everyone when they pled guilty. I did my time and stayed out of trouble and then on December 16, 2021, a notice to appear was filed by the Department of Homeland Security saying that I would be facing immigration issues. I'm not asking that the charges be dismissed, or even for a trial, but I would like to withdraw my plea and enter a new plea without a [MOPA]. I understand I would be giving up the protections that came with the MOPA and could face additional jail time, fines and supervised release.

Dkt. No. 39 at 2–3.

For relief, Krivoulian asks that he be allowed to "withdraw [his] plea and enter a new plea without a MOPA" because "[t]he MOPA is what is enhancing the

money laundering amount even though the amount was only $1,850." Dkt. No. 30 at 12.

On October 31, 2022, the Government opposed Krivoulian's Section 2255 Motion on three grounds. Dkt. No. 33. First, the Government claims Krivoulian's motion is untimely. *Id.* at 5–7. Second, the Government contends that Singh's performance was not deficient. *Id.* at 9–10. Third, the Government asserts that, even if the motion is timely, and even if counsel's performance was deficient, Krivoulian cannot establish prejudice because both the MOPA and this Court independently informed Krivoulian of the correct immigration consequences of his guilty plea—that it was a "virtual certainty" that he would be deported—before he pled guilty. *Id.* at 10.

Krivoulian replied on December 22, 2022. Dkt. No. 39.[4] The Court elected to decide this matter without a hearing pursuant to Local Rule 7.1(c), *see* Dkt. No. 40, and this Order follows.

## DISCUSSION

Assuming that Singh's performance was deficient under *Strickland*'s first prong, Krivoulian's Motion is nevertheless DENIED because he cannot demonstrate prejudice under *Strickland*'s second prong.

---

[4]The arguments made in Krivoulian's Reply Brief are not summarized here because they have already been included in the summary of his Motion above.

10

This Court independently, clearly, and unequivocally advised Krivoulian of the actual immigration consequences of his guilty plea. Moreover, while under oath, Krivoulian informed this Court that he understood those consequences, including that it was a "virtual certainty" that he would be deported as a result of the conviction. *See* Plea Tr. at 10:4–7; Dkt. No. 12 at 3–4, 6. Thus, Krivoulian cannot show a "reasonable probability that, but for his counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," *see Womack*, 497 F.3d at 1002, or that "the outcome of the plea process would have been different with competent advice." *See Lafler*, 566 U.S. at 163. On the contrary, he received that competent advice from this Court on July 24, 2020, and he proceeded to plead guilty anyway.[5]

Similarly, the MOPA states the immigration consequences of Krivoulian's guilty plea in black and white terms, and Krivoulian affixed his signature to that document, attesting that he understood and agreed to the provisions therein. This Court accepted Krivoulian's verbal and written representations, giving him the benefit of the plea agreement. Krivoulian may not claw back his own written

---

[5] Krivoulian also stated under oath that he was admitting to laundering an amount between $15,000 and $40,000, not $1,850. Plea Tr. at 10:4–7; Dkt. No. 12 at 3–4, 6. Even if $1,850 had been the correct number, Krivoulian has done nothing to demonstrate that lesser amount would result in a different immigration consequence.

admissions in the MOPA by now saying he did not understand what he was signing.

Even if, as Krivoulian claims, Singh advised Krivoulian that the Court did not mean what it said, and that Krivoulian should effectively ignore the Court's guidance that his conviction would almost certainly result in his deportation, it was up to Krivoulian to answer honestly and completely when this Court asked whether Krivoulian understood and agreed to the terms of the Plea Agreement. Were it otherwise, plea colloquies and MOPAs would be rendered meaningless whenever a defendant later claimed his *attorney* failed to independently confirm the Court's guidance. Indeed, the purpose of the independent plea colloquy between the Court and an individual defendant is to affirmatively ensure, on-the-record, that the defendant understands his plea, separate and apart from his attorney's advice.

Finally, Krivoulian's representations about this Court's statements during his sentencing hearing are, in fact, *mis*representations. First and foremost, the sentencing hearing took place in January 2021, several months after Krivoulian had already pled guilty to his crime and acknowledged the immigration consequences of doing so. Therefore, any confusion Krivoulian may have experienced during sentencing is irrelevant to whether he understood his guilty plea and its consequences during the July 2020 plea hearing. Second, though the

Court did state during sentencing that deportation may be an open question,[6] it did so only because of Defendant's lawful permanent resident ("LPR") status and the status of his spouse as a United States citizen, facts revealed to the Court for the first time in the October 2020 presentence investigation report. The Court's comments were not made, as Krivoulian implies, because of uncertainty as to whether Krivoulian pled guilty to a deportable offense.

---

[6]The Court's statements during the sentencing hearing included:

> *The defendant is married without children, he does have a spouse who is a supportive spouse, a United States citizen spouse, and it is unclear, given that and given the defendant's LPR status, whether or not he will be deported*; so the Court notes that as well. . . .
>
> There is also going to be three years of supervised release. There is some reference in the guidelines—the sentencing guidelines, particularly in 5D1.1 which talks about not imposing a term of supervised release for someone who is likely facing deportation. *There's some signs in here that maybe deportation is not in your future. I express no view on that, that's not my decision, but I see why that might be the case, both because of your status, because of the supportive and U.S. resident status, U.S. citizen status of your spouse*, and it does also seem to me that CIS had some opportunity to deport you previous to this and did not, for what reason I don't know. But there's some things in the record, some items in the record that suggests to me that maybe deportation is not what you're facing. And for that reason, for an added measure of deterrence and the ability of probation—our probation office to supervise you, were you to avoid deportation, again I express no view whatsoever on the advisability of that, I think that makes sense for the Court to impose a three-year term, were you to remain in the United States or come into the United States in the future for whatever reason.

Dkt. No. 39-1 at 12:1–5, 16:8–17:3 (emphasis added).

13

## CONCLUSION

For the reasons set forth herein, the Court DENIES the Section 2255 Motion, Dkt. No. 30.  Further, because Krivoulian has not shown he was denied a constitutional right or that reasonable jurists could debate the instant Motion, the Court DENIES the issuance of a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c)(2) (stating a Certificate of Appealability should issue "if the applicant has made a substantial showing of the denial of a constitutional right"); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (stating this standard is met if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further").

The Clerk is instructed to enter Judgment in favor of the government and then CLOSE Civil Case No. 22-cv-00433-DKW-RT.

IT IS SO ORDERED.

Dated:  January 17, 2023 at Honolulu, Hawaiʻi.

Derrick K. Watson
Chief United States District Judge

*Alexander Krivoulian v. United States of America*; CR 20-00029 DKW and CV 22-00433 DKW-RT; **ORDER DENYING PETITIONER'S 28 U.S.C. § 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE**